JANE THOMPSON, Appellant, *v.* THE NEW YORK
CENTRAL AND HUDSON RIVER RAILROAD COM-
PANY, Respondent.

*Contributory negligence—duty of a person approaching a railroad track with a team—
proof of the ringing of a bell required by section 61, 2 R. S. (6th ed.), 542 — the
presumption is, that the statute has been complied with.*

This action was brought to recover damages for the destruction of a team of
horses and a truck to which they were attached, while crossing the defendant's
tracks. The driver of the team testified that he was approaching the crossing
from the west between a walk and a slow jog; that he looked to the north as soon
as he could get an advantageous view of the track ; he was then about 100 feet
from it ; he looked again, first north and then south, when about sixty feet
from the track ; after that he was watching a boy who was carelessly approach-
ing him in the road, being about twenty feet in front of him ; he had to look
after the boy so as not to run over him ; he saw nothing on the track when
he looked, nor did he hear any sound; until the train was about 400 feet
from the crossing, when he heard the whistle; his horses were then about three
feet from the track, going at a nice walk; he then tried to stop and back the
team, but was unable to do so. The view of the track, approaching it from
the west, was interrupted by trees, poles and other obstacles, which interrup-
tion continued until the track was nearly reached. The driver was familiar
with the locality, having driven on the road for many years.

*Held,* that the complaint was properly dismissed, upon the ground that the
plaintiff, the driver, was guilty of contributory negligence.

*Salter* v. *Utica and Black River Railroad Co.* (75 N. Y., 273), followed.

That the fact that the driver did not hear the ringing of a bell on the engine, did
not prove that the bell had not been rung as required by section 61 (2 R. S.
[6th ed.], 542) ; that the presumption, if any, was that the statute had been
complied with.

Appeal from a judgment, entered upon the dismissal of the plain-
tiff's complaint at the close of the plaintiff's case, and from an order
granting an additional allowance to the defendant of five per cent.

*Nelson J. Waterbury,* for the appellant.

*Frank Loomis,* for the respondent.

Brady, J. :

This action was brought to recover damages for the destruction
of a team of horses, and a truck to which they were attached,
through the negligence of the defendant. The accident took place
at Tremont, in this county, and upon a railroad track operated by

the defendant. Upon the conclusion of the evidence of the plaintiff, the complaint was dismissed on the ground of contributory negligence. The history of the accident depends chiefly upon the testimony of the driver, of whose examination and cross-examination the following presents the salient and important features :

" I approached the track between a walk and a slow jog ; I think it was a walk, partly, the horses were going ; between that and a slow trot ; as I approached the railroad track I looked both ways ; I looked north ; I looked north as soon as I thought I could get an advantageous sight ; when I looked north first I consider I was about 100 feet from the railroad track ; then I looked secondly ; I had got as far as the sidewalk in front of the houses on the west side of the Railroad avenue when I looked ; I looked then about there ; that is what I mean by 100 feet ; I looked both ways afterwards when I got to about sixty feet from the track, and could see no train ; I looked north afterwards ; after I looked north the last time I did not look again until I was within about sixty feet from the track ; I did not look any more ; I looked south after I looked north, after I had passed this sixty feet ; I suppose I was about thirty or thirty-five feet from the track when I looked south ; I did not see anything on the railroad track when I looked either north or south ; I did not hear any sound from the railroad when I looked last ; I approached the track ; the first time I heard the whistle of this engine the horses were then about three feet of the track and were going at a nice walk and I could not stop them until the horses's feet got on the down track, and it came so swift I saw I had no time to cross the track, and I thought to save the horses by pulling them back, but I had not time, the train came so swift ; after I looked south that time I saw a boy in the road in front of me ; he had a tin pail in his hand ; he was walking fast in front of me and the horses ; he was in about twenty feet of the horses ; his nearness to me in front of the horses required me to look out for the boy and not run over him ; while I was looking out for the boy I did not hear any sound ; I did after ; about the time I was looking out for the boy the train whistled, and I was in a bad fix to save the boy, myself and the horses, and it came so swift on me I could not do any better than pull the horses back ; as near as I can judge when I heard the whistle the train was from 300 to 400 feet off ; I

did not hear any whistle before I heard that one; I did not hear the ringing of any bell; I did not hear any signal whatever, except that one, before that one I heard as my horses were about going on the track, that is the only one I heard; there was not a person there except this boy to give any warning of an approach of the train; he did not give any warning; the train came along at a swift rate and these horses' shoulders was on the west side of the down track; I had not time to back them; I pulled hard enough back; it struck the leading horse about the neck and shoulders and swept him away from the pole of the wagon and threw him down the track and then struck the other horse and demolished both of them in an instant; the horses were killed; after the horses were struck and killed it struck the wagon; it struck it instantly after the horses and took the pole from the wagon and broke that, and with the shock it threw me out of the wagon in a somersault into the hard road; it was a dull, foggy morning like; there was no flagman there that morning."

Cross-examined.— " I had an ordinary lumber wagon — no load; from Ittner's villa, 400 feet or a little over west from the place where the accident occurred, I walked — or a slow jog — just the same; 'a slow gait not faster than a walk; when I was, as I estimate it, 100 feet west of the west track, I looked to the north and south, and then I looked again a second time; when, the way I estimate it, I was about sixty feet west of the west track I looked south then and not to the north; when I was about 100 feet, as I estimate, west of the track, I looked both to the north and south along the railroad as far as I could both ways; that is, to the south and north; I looked again when I was about sixty feet; I looked then both ways to the north and to the south; I looked south first; then I was in the act of looking north when this boy was running up to my team, and I gave my attention to the boy; I did not look north after that; I was in the act of looking when this boy was approaching the horses, and I did not want to kill the boy; he was running west and I was going to the east; I was driving in the middle of the road; the boy was running in front of the horses in the middle of the road; he had a tin can in his hand; when I first noticed him he was about twenty feet in front of me and running, coming towards me; there was no difficulty of his turning out to either side of me; then I

kept on towards the track; my team was about four feet from the track when I heard this whistle, and the train was coming towards me about 400 feet distant; I saw it then; the horses were on the motion and I could not stop them until they got on to the rail of the down track; I pulled the lines tight and tried to back them; I did not make an effort to turn in either direction; backed them straight, simply pulled back; I remember answering on the former trial, "as I came toward the railroad track, when I was about seventy-five feet away from the railroad track, I looked towards the north," that is so; I remember being asked: "And that was the last time you looked to the north?" and answering, "that was the last time;" and I remember being asked: "And then you looked to the south immediately afterwards?" and answering, "yes;" and being asked: "And that was the last time you looked to the south?" and answering, "yes;" and being asked: "After that you looked straight ahead?" and answering, "yes;" and being asked: "Until you were hit?" and answering, "yes."

To the COURT — "When I first saw the boy I speak of he was coming west; he was approaching from the east side, coming from the east side to the west side; he was on the track — on the up track — when the horses were on the down track; he was only about six feet from me; I had not got to him at the time the collision occurred, but the boy was running reckless."

Redirect — "I may vary a little, but I think I am about the same in my memory as on the former trial."

It will be perceived from a perusal of this evidence that there was no flagman at the crossing or station, and the whistle was not heard by the driver of the plaintiff's team until the horses were within four feet of the track; and further, that though he was going slowly he was disturbed by the presence of a boy who was coming towards his team, and with reference to whom he had to exercise some caution; and moreover, that although he endeavored to pull his horses off the track he was unable to do so. It is true that he failed to turn them to the right or to the left, as perhaps he might have done. It was also established by the evidence that the view of the track, approaching it from the west going east on the road on which the team traveled, was interrupted by trees, poles and other obstacles, which continue until the track is nearly reached.

It will have been observed also that the driver looked to the south when he was sixty feet from the track, but, failed to look to the north, although he looked to the north and to the south when he was one hundred feet from the track, and that he was in the act of looking north when sixty feet away, but seeing the boy already mentioned running up to his team he devoted his attention to him. He says distinctly that he did not look north after that. He was watching the boy, who was approaching the horses, as he did not want to kill him. But he said on cross-examination, it will have been perceived also, that he was driving in the middle of the road; that the boy was running in front of the horses in the middle of the road; that he had a tin can in his hand, and that when hé first noticed him he was about twenty feet in front of him and running in towards him. He said there was no difficulty in his turning out either side of him, and further, "I kept on towards the track; my team was about four feet from the track when I heard the whistle." He said to the court further, as will have been perceived: "When I first saw the boy he was coming west; he was approaching from the east side — coming from the east side to the west side; he was on the track — on the up track; when the horses were on the down track he was only about six feet from me; I had not got to him at the time the collision occurred, but the boy was running reckless."

It will have been observed, also, that the driver was perfectly familiar with the locality, having driven on and about it for a period of many years. In regard to the rules of law by which these facts are to be governed, the authorities, it may be said, are somewhat in conflict, perhaps.

In the case of *Ernst* v. *Hudson River Railroad Company* (35 N. Y., 9) the proposition was enunciated, sustained by a citation of numerous authorities, that the citizen who, on the public highway, approaches a railroad track and can neither see nor hear any indication of a moving train, is not chargeable in law with negligence for assuming that there is no car sufficiently near to make the crossing dangerous. Applying this rule to the plaintiff's case, the driver was not guilty of negligence in approaching the train, because, according to his evidence, he heard no whistle and had no indication of an approaching train until it was only four hundred feet distant, and going at a rate of speed which would cover that space in about

fifteen or sixteen seconds, at which time his horses were four feet from the track and he found it impossible to pull them back. He was rightfully there on the principle of that case, therefore, and justified in what he did under the circumstances according to the rule declared in that case. The learned court, in speaking of the public, said : " When they draw near a railway crossing and the flagman gives no warning; when no sign or sound indicates the presence or approach of a train, they assume that they may safely cross and proceed quietly on their way."

In *Davis* v. *New York Central and Hudson River Railroad Company* (47 N. Y., 400), Justice Grover said : " The law required of the testator the exercise of such a degree of care as prudent persons, knowing the danger to be encountered and attentive to their safety, would take to shield themselves from injury therefrom. It is settled that this requires a vigilant use of the eyes in looking, and of the ears in listening, upon approaching a highway crossing, to ascertain whether there is a train approaching, and that if by the vigilant use of these faculties, while approaching the crossing, the vicinity of such a train may be discovered by the traveler in time to avoid a collision therewith, the omission so to exercise them and thus to avoid an injury is such negligence as will bar a recovery therefor, although the railroad company may have been guilty of negligence contributing thereto." And further : " If, with a team, it does not require that he should get out of the vehicle in which he is riding, leave his team and go to the track for the purpose of looking, or to rise up in his vehicle and go upon the track in a standing position, to enable him to obtain a better view of the track. * * * It could not, therefore, be held as a question of law that his failure sooner to discover the train was the result of his inattention to the danger of his situation or his failure to use his senses to guard against it. These questions, upon the evidence, should have been submitted to the jury." And in the Ernst case it was also said by the learned justice delivering the opinion : " In the case of *Brown* v. *The New York Central Railroad Company*, decided at the last June term, we held that no culpable negligence was established, though it was proved by the driver of the coach demolished by the collision that he did not look in the direction from which the cars were approaching until his horses were on the track, the

usual signal of danger not being given as they advanced to the crossing; and this, though it appeared in evidence that if he had looked before, he would have seen them in season to avoid the collision. (32 N. Y., 597.) The doctrine of that case was unanimously reaffirmed upon a like state of facts at the last December term of this court." (*Stilwell* v. *The New York Central Railroad Company*, 34 N. Y., 29.)

In *Weber* v. *New York Central and Hudson River Railroad Company* (67 N. Y., 587), in which the opinion was given by FOLGER, J., all concurring, the memorandum is as follows: "The court, after giving to the jury the law as laid down on the former appeal, asked them the following questions: Are you satisfied that when the plaintiff's horses reached the fourth track, where the accident happened, he could have seen the approaching train, and ought he to have looked? Was it negligence in him not to have looked? And could he have stopped in time to have avoided injury? The defendant's counsel, thereafter, requested the court to charge that if plaintiff could have, by the ordinary use of his faculties, ascertained the approach of the train before he reached the fourth track and in time to have avoided it, his omission to do so was negligence. The court declined to charge further than it had already. *Held*, no error; that an omission to look, at the point named, under the circumstances, would not have been, as matter of law, negligence."

In the case of *Salter* v. *Utica and Black River Railroad Company* (75 N. Y., 273), the obligation to use the senses in approaching a railroad crossing seems to be more broadly stated, however, than in any of the cases, to which reference has been made or in any of the cases to which our attention was called by the appellant's counsel in his learned and elaborate brief on the subject. The opinion of Justice MILLER was concurred in by FOLGER and EARL, JJ., on the ground that there was error in refusing the request to charge as to keeping the team under control, without expressing an opinion as to other points; but all the other judges united upon the points discussed by Judge MILLER. The learned judge said, in considering the conduct of the deceased: "The principle which requires that a man shall use his eyes and ears in crossing a railroad track, so far as he has opportunity to do

so, equally demands that he shall employ his faculties in managing his team and thus keep out of danger." He said further: "The fact that the train was behind time does not relieve the deceased from the duty of being careful, for railroad crossings near villages are liable to be used at any time, without regard to the regular periods when trains are due." And the court further said : "Considering the circumstances of the case, the danger of crossing the track with his ears covered so as to obstruct the sound, and the obstructions to a full view of the railroad track, we think it was the duty of the deceased to approach the crossing in such a manner, and at such a rate of speed, and with such entire control over his team, that he could have stopped them if required."

The application of the principles of this case to the circumstances marking the loss of the plaintiff's property, would seem to enforce the result that the driver was guilty of negligence. He knew of the locality, for he had been familiar with it a great many years. He must have known, therefore, and there is no pretense that he did not, that in approaching the track from the east the view on the north side was obstructed by permanent features which had existed for some time at least. He knew also that the flagman was not present, and yet, notwithstanding that he was embarrassed by the presence of a boy whom he felt obliged to avoid injuring, and, therefore, without proper consideration of the trains that might approach from the north which he ought to have entertained, and without looking to the north at a point nearer than sixty feet from the crossing, but devoting his attention to the boy who was in front of him, he proceeded onward, instead of stopping either that the boy might get out of his way or that he might relieve himself in some way from the disturbance which the boy gave him, and at a place which was necessarily dangerous, in consequence of its character and the presence of the track and the running of the defendant's engines over it. As suggested by the counsel for the respondents, it seems to be clear, from the direct evidence, that the driver attempted to excuse himself by admitting that he gave his attention to the boy above mentioned, who at no time prior to the collision was nearer than the east track, claiming that his team was on a walk and admitting that the boy was free to turn out on either side, and thus showing that his attention was directed to the boy to

prevent his injury by the team, when it should have been given to the train. He thus abandoned the elements of proper care and caution at a time when it was important that he should have given his direct and exclusive attention to a danger which was commanding if not imminent.

The absence of a flagman at the crossing does not aid the plaintiff, inasmuch as it does not establish the liability of the defendants (*Culhane* v. *N. Y. C. and H. R. R. R. Co.*, 60 N. Y., 133), and it may be said that in the spirit of the cases to which reference has been made, involving the use of eyes and ears, the absence of a flagman imposed a greater amount of caution upon the driver, if that circumstance were unusual or extraordinary. He could not rely upon any signal or information then from such a person.

The only responsive feature of this case to the views thus expressed is to be found in the statute, which requires the ringing of a bell at least eighty rods from a crossing, and the continuance of such ringing until the crossing shall have been passed. (2 R. S. [6th ed.], 542). It is not effectual, however, for the reason that the proof does not show that the ringing of the bell did not commence at the point indicated, but that the driver of the team did not hear it at that distance from the crossing, his statement being that he heard it when it was only four hundred feet distant. This fact alone would not in itself be sufficient to overcome the evidence recited showing the controlling incidents of the occasion, and particularly because the driver, not having heard the sound of the bell, is no proof that the ringing was not begun at the proper place and continued. The presumption, if any is to be indulged, is that the statute was complied with.

The best consideration, therefore, which can be given this case results in the conviction that the judgment is right and must be affirmed.

Ordered accordingly, with costs.

DAVIS, P. J., and DANIELS, J., concurred.

Judgment affirmed, with costs.